R. C. WHITLEY, Respondent, v. CHICAGO, BUR-LINGTON & QUINCY RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, November 7, 1904.

1. RAILROADS: Switch Yards: Degree of Care: Negligence: Burden. A railway yard is a dangerous place and a car inspector lawfully in such yard must show that the injury received by him was the result of a negligent or wrongful act of the company.

2. ———: ———: · Negligence: Scienter: Evidence. The employees of a railroad, switching in its yards, must be shown to have known the dangerous situation of a car inspector before the company can be liable for such inspector's injuries resulting from the switching; and the evidence is reviewed and held insufficient to warrant a verdict for the inspector.

Appeal from Linn Circuit Court.—*Hon. John P. Butler,* Judge.

REVERSED.

*A. W. Mullins* for appellant.

(1)   The verdict in this case is against the weight of evidence.   The refusal of the court to set it aside, was error.   Hemetreich v. Corlas, 24 Mo. App. 264; Spooner v. Railway, 20 Mo. App. 403; Wright v. Railway, 20 Mo. App. 481; Brewing Co. v. Bodman, 12 Mo. App. 573; O'Donnell v. Railway, 7 Mo. App. 190; Taylor v. Fox, 16 Mo. App. 527; Walton v. Railway, 49 Mo. App. 620; Price v. Evans, 49 Mo. App. 396; Spohn v. Railway, 87 Mo. 74; Lyonberger v. Spolman, 16 Mo. App. 392.   (2)   The defendant's instruction in the nature of a demurrer to plaintiff's evidence should have been given, and instruction 8 asked by defendant, that under all the evidence in the case plaintiff was not entitled to recover, should also have been given.   Plaintiff voluntarily put himself in a place of danger.   Defendant's train men had no knowledge whatever that the plaintiff intended to go in between the cars to work, or that he was in between them, when the accident happened.   Plaintiff's own thoughtlessness, recklessness and rashness was the direct and proximate cause of his injury.   He is not, therefore, entitled to recover. Varnell v. Railway, 113 Mo. 570; Richardson v. Mesker, 171 Mo. 666; Thompson v. Railway, 86 Mo. App. 141; Henry v. Railway, 76 Mo. 288; Hudson v. Railway, 101 Mo. 13; Holloran v. Iron & Foundry Co., 133 Mo. 470; Hogan v. Railway, 150 Mo. 36.

*H. E. Maybee, A. A. Bailey* and *O. F. Libby* for respondent.

(1)   The respondent Whitley had a right to rely on brakeman Watson's statement that they were through switching and that he would thereby be protected, the conductor being absent from the train. Moore v. Railroad, 85 Mo. 588; 1 Addison Torts, p. 605, Wood Ed.; Greene v. Railroad, 31 Minn. 248.   (2)   Even a conductor who uncouples cars without notifying brakemen is guilty of negligence.   Neilon v. Railroad,

85 Mo. 599. (3) The instructions for both the plaintiff and defendant fairly present the law of the case. Karl v. Railroad, 55 Mo. 476; Hill Bros. v. Bank, 73 S. W. 307; Chinn v. Railroad, 75 S. W. 375; Dougherty v. Railway, 97 Mo. 647; Owens v. Railway, 95 Mo. 169; Hanhiel v. Transit Co., not yet reported. (4) When there is evidence to support the verdict it will not be disturbed on appeal. Hill Bros. v. Bank, 73 S. W. 307; Chinn v. Railroad, 75 S. W. 375; Cook v. Railroad, 63 Mo. 397; Hyde v. Book & News Co., 32 Mo. App. 298.

SMITH, P. J.—The petition amongst other things alleged that on September 26, 1902, while the plaintiff was in the employ of the defendant in the capacity of car inspector and repairer at Laclede station on its line in this State, a freight train consisting of a locomotive and a number of cars arrived at said station and then proceeded south to the long west side track south of said station where it stopped for the purpose of setting out cars; that after plaintiff had been informed by the brakeman in charge of such train engaged in conducting such work of setting out cars that the train was through setting out cars from his train and placing them on the side track where plaintiff had work to do, plaintiff believing and relying on such statement of the brakeman on such train that the work of the train crew was through on the track where he was engaged in repairing cars and that the locomotive and cars attached thereto would not thereafter be backed in on such long side track where he had work to do, after waiting until he (plaintiff) could see the defendant's locomotive and cars attached thereto had passed clear out from the long side track where he had work to do and was on the main track, plaintiff then proceeded to make necessary repairs upon a connecting link between the lock pin and the lifting bar on drawhead attached to one of the cars stored on the long side track aforesaid, and to make such necessary and needed

repairs it became and was necessary for plaintiff to
do such work between two cars; that while plaintiff
was so engaged in repairing such car on the long side
track aforesaid, and while plaintiff was repairing the
connecting coupling between lock pin and the lift-
ing bar on such car the defendant by its agents, ser-
vants and employees in charge of the locomotive and
cars thereto attached, well knowing that plaintiff was
at work between such cars stored on such long track
aforesaid, left the main track where they were when
plaintiff proceeded to his work, and after telling plain-
tiff they were through with their work on such track,
carelessly, negligently and wantonly proceeded to back,
or kick, such cars on the main track detached from the
locomotive on main track in and through the switch and
upon the long side track where they had previously in-
formed plaintiff that they were through working and
carelessly and negligently run such cars back from
locomotive, detached, without notifying plaintiff and
without sounding the steam whistle or ringing the bell
upon the locomotive, and without giving any signal
whatever or warning of any kind of the approach of
such cars upon such side track, and carelessly, neg-
ligently and wantonly run such locomotive and cars,
detached, from said locomotive backwards at a high rate
of speed, without any brakeman, watchman or other
person stationed on the top of such rear car to give sig-
nals of the approach of such locomotive and cars, and
with great force and violence "kicked" the cars being
pushed by such locomotive in and upon the side track
where plaintiff was repairing defendant's car and
against the car in front of the one plaintiff was re-
pairing with such force and violence as to run the
car that plaintiff was repairing against and upon
plaintiff, and without fault or negligence on plaintiff's
part, causing his left hand to be caught, mashed and
the bones broken, his right hip sprained, bruised, lamed
and permanently injured, his ribs broken, back injured,

and made sick and sore, from which injuries received as aforesaid it became necessary to amputate the forefinger on plaintiff's left hand, the rest of his fingers on such hand otherwise made stiff and permanently made weak and lame and plaintiff's spine and ribs so injured that by reason of the wrongful and negligent acts of defendant plaintiff had been injured and damaged, etc.

The answer contained a general denial and the plea of contributory negligence. There was a trial resulting in judgment for plaintiff and defendant appealed.

At the conclusion of all the evidence the defendant interposed a demurrer which was denied, and this action of the court, it is now insisted, was an error which requires a reversal of the judgment. Referring to the evidence contained in the record before us, and from that it appears that the plaintiff at the time of the receipt of the injury complained of was a car inspector and repairer in the employ of defendant at Laclede station, the place of the injury, and that at that station defendant has two side tracks, one on either side of the main line. A freight train numbered five, in the afternoon of the day of the injury, arrived at said station where it made a short stop and then proceeded along the main track to the south end of the side tracks for the purpose of switching and disposing of the cars on it which were twelve in number.

The plaintiff testified that he was dressed in his working clothes and had in his hands his tools for performing the services required of him at the time of the arrival of the train at the station. When the train stopped he there inspected the east side of the cars and found several things that needed repairs, amongst them being a lock pin disconnected from the lever. "The chain was a lap-ring in place of what we used to call a lap-pin that is on a coal car. That was a part of the coupling apparatus by which the back cars were coupled to-

gether. It is what they call a janny-coupler. When they go together they go like this (indicating). It is to save the brakeman from going in between the cars. There is a sort of bar that runs out to the side of the car. The brakeman can raise that flange and raise the pin without going in between the cars. Yes, it is a part of my duty to do that repairing. The company instructed me to do everything that was possible for me to do in that line. There was other work to be done on those cars before they were set back on the main line and they switched these cars in. I rode down on the train and the caboose was cut off up at the upper end of the long track and I inspected the east side of the cars that were brought in on No. 5, and when they got over the crossing, I got on the train and rode down to the lower end of the yard, and the trainmen went to switching the cars to get them in place where they should be. The caboose was left at the upper end of the west long track. That was south of the Hannibal & St. Joe crossing. The balance of the train went on south about a quarter of a mile, down to the lower end of the switching yard. I got on the train and rode down to the place where they were purposing to do the switching. The engine men and the brakemen went down and myself. I think the conductor was on the caboose. He did not go down to the lower end of the yard where the switching was being done. I think there was twelve cars in the train. In my examination of the flanges and wheels, I did not go between the cars. I discovered up at the depot that there was something the matter with the connection between the pin and the link. I had a monkey wrench and hammer with me. I merely know the brakemen when I see them. I do not know their names. There was quite a little switching done there. The cars were on the west end of the long track where I got hurt. I think they set in four. Mr. Summers had charge of the locomotive as engineer, under the direction of the brakeman. The

brakeman gave him the signal, and he did whatever the brakeman ordered him to do. They sometimes both give signals. Sometimes one will give signals which cut off cars and maybe the other will do that. On this occasion, one of them was cutting off the cars and the other was setting the brakes. The head brakeman who was cutting out the cars was the one who spoke about the switching that they were doing. He was up toward the engine of the train. The other brakeman was further down in the yard where he had set some brakes on the cars. The head brakeman was the man who was down with the engineer picking up the cars and having them set in on the long track. The head brakeman had charge of the switching. The train crew was switching four or five minutes. The conductor was up at the caboose a quarter of a mile away. The head brakeman always has charge of the switching in the absence of the conductor."

The plaintiff further testified that when he supposed the switching was done he asked the head brakeman: "Are you all done your switching?" And he answered, "yes." "When he had this conversation the brakeman was on the west side of the car with his feet on the ladder, and I was on the east side of the car; we were just the width of a car apart. I was probably a foot or two from the car. I spoke very loud as they started to pull out. He answered back in a loud tone, 'yes, sir.' I then went back to make this repair. This broken coupling was several cars from the end of the train. I made the connection and found it was a little too short and pounded the ring together so that it would link together. The head brakeman knew I was carrepairer there. I had repaired cars on this train before. To repair this link or chain I had to go in between the two freight cars. While I was in there they kicked another car on to the car I was working on, caught this finger and cut a great gash, and cut this one

entirely off all but a little bit. I have no use of the second finger of the left hand to lift anything. The car struck me in the right hip when they came together.''

The plaintiff on cross-examination further testified that at the time he talked to the brakeman the locomotive was pulling three cars down to the south end of the side track and that they had to be disposed of and put on some track—that they were not done putting the train all away; that he did not know whether or not when he asked the head brakeman the question just stated the latter understood him—plaintiff.

About twenty days after that of the injury, the plaintiff made a written statement to the defendant in relation to his injury and the cause of it, and in this statement it was affirmed: ''On arrival of Number 5, K. C., at Laclede, I looked east side of train over while train was standing at crossing. Got on train, went down in yard, got off at south end long track, looked over west side train. They made two or three switches and backed in on side track; cut off two or three cars with engine, and pulled out. I asked brakeman, 'Are you all done?' He said, 'yes.' He was on west side of car and I was on east side. I don't know whether he understood me or not.''

Watson, the head brakeman, testified that he did the switching and cutting out the cars under the instruction of the conductor; that he knew the plaintiff was defendant's car inspector and that he had frequently inspected and repaired witness's trains prior to the injury. He knew that plaintiff was present when the switching was being done and he—plaintiff—was sitting close to the track and two or three car lengths from the switch stand. He was sitting there watching the trucks as they passed; that the plaintiff did not speak to him there nor did he—witness—know that plaintiff had left the place where he was sitting and gone between the cars.

It is thus disclosed that at the time of plaintiff's injury the defendant's servants were engaged in the operation of switching its cars within its private yards through which there appears to have been no public way. The plaintiff, who was defendant's car inspector, was lawfully in its yard at the place where the switching was going on. In performing the duty of inspecting the defendant's incoming trans, he would examine them first one side and then the other, and if anything was discovered requiring repairs he would immediately proceed to make the same. There is nothing in the evidence tending to prove that on the occasion when plaintiff was injured the defendant's servants engaged in switching negligently shunted the cars. The defendant owed the plaintiff the duty of exercising reasonable care. A railway yard is a dangerous place but before the company operating it can be made liable for an injury received by one who is lawfully within it, it must be shown that the injury resulted from the negligent or wrongful act of the company or its employees. Thompson on Negl. 1849; Railway v. Whitbeck, 57 Kan. 729. It may, we think, be asserted as an indisputable proposition that unless the employees of the defendant who were engaged in the switching knew or ought to have known when they shunted the car which struck one of the two standing on the side track which the plaintiff was then between, there can be no recovery for the injury to plaintiff resulting from the impact. There is nothing in the evidence which directly or inferentially shows any such knowledge.

It is true, the plaintiff testified that the head brakeman in answer to the question, "are you done switching?" answered, "yes." But he testified further that he did not know whether the brakeman understood his question. It is clear to us that if he asked the question the brakeman did not understand him, for it is admitted by plaintiff that when he received the brakeman's answer he saw with his own eyes that the cars

Whitley v. Railroad.

had not all been set off—that two or three of them then remained to be disposed of before the switching required was completed. The visible physical facts there confronting him were sufficient to warn him that either the switchman had misunderstood him or *vice versa,* and that the switching was not then completed. Plaintiff does not pretend that in his query to the head brakeman that he embraced the information that he desired to go between the cars then standing on the side track to make repairs, or that the brakeman's answer was made with any such knowledge. It seems to us that it may be fairly and clearly inferred from the facts to which the plaintiff testified that when he went between the two cars for the purpose of doing the repairing there needed that he knew the switchmen were not through; that there were other cars to be yet disposed of and that he had the thought that such other cars would be set out on the other side track or else he did not think at all but recklessly went between the cars and thereby assumed the peril of the impact resulting from the shunting of other cars on that track.

Even if the defendant's brakeman did understand plaintiff's question it contained no intimation that the latter intended going between the shunted cars for any purpose. And if the answer of the brakeman to this question was untrue, the plaintiff was not misled by it because the physical facts then occurring in his plain view told him of its untruthfulness. It was a case where the action spoke louder and more conclusively than the words. There is no fact or circumstance disclosed by the evidence showing that the defendant's brakeman might have reasonably anticipated that the plaintiff was between the cars on the side track before the switching was completed, or that enjoined upon them the duty to exercise active diligence to discover his presence there.

From an examination of all the evidence, we are unable to reach any other conclusion than that the prox-

imate cause of the plaintiff's injury is referable to his own negligence rather than that of the defendant. And for that reason the judgment in his favor must be reversed. All concur.